**In re CRAZY EDDIE, INC., Debtor.**

**Bankruptcy No. 89 B 11313 (TLB).**

United States Bankruptcy Court,
S.D. New York.

Aug. 17, 1990.

Traub, Bonacquist, Yellen & Fox, New York City by Paul Traub and Michael S. Fox, for petitioning creditors.

Pryor, Cashman, Sherman & Flynn, New York City by James A. Janowitz and Mark C. Jacobs, for debtor.

Otterbourg, Steindler, Houston & Rosen, P.C., New York City by Gary F. Herbst, for Unsecured Creditors Committee.

Berlack, Israels & Lieberman, New York City by Edward Weisfelner, for Official Bondholders Committee.

Harold D. Jones, United States Trustee New York City by Neal S. Mann.

## DECISION AWARDING PETITIONING CREDITORS COMPENSATION

TINA L. BROZMAN, Bankruptcy Judge.

Are petitioning creditors entitled to have their attorneys' expenses and fees reimbursed from the estate when the debtor voluntarily files for relief under Chapter 11 of the Bankruptcy Code (the Code) prior to trial on the involuntary petition? Traub, Bonacquist, Yellen & Fox (TBY & F), the law firm representing the petitioning creditors [1] who filed an involuntary Chapter 7 petition against Crazy Eddie, Inc. (Crazy Eddie or the Debtor) argues that §§ 503(b)(3)(A) and (b)(4) of the Code authorize reimbursement as an administrative expense of the estate. In the alternative, TBY & F asserts entitlement to these amounts because the efforts of its clients in bringing Crazy Eddie under the jurisdiction of the bankruptcy court resulted in a substantial contribution to the estate as contemplated by Code §§ 503(b)(3)(D) and (b)(4). Crazy Eddie objects to the TBY & F's fee application, arguing that no compensation should be awarded because the filing of the involuntary petition torpedoed an out of court workout tentatively reached with several of its creditors and left the Debtor no alternative but to file a voluntary petition. The Official Debentureholders' Committee in the Chapter 11 case joins in Crazy Eddie's opposition; the Official Unsecured Creditors' Committee takes no position. For the reasons set forth below and notwithstanding the filing's alleged impact on the workout efforts, I find that TBY & F is entitled to an award of compensation.

Crazy Eddie is a publicly held corporation which was engaged in the retail sale of electronic equipment and had been experiencing financial difficulties long before the filing of either bankruptcy petition. In November, 1987, new management gained control of Crazy Eddie at a time when the company was suffering from the effects of an alleged massive scheme of fraud and corporate waste perpetrated by its former

1. The five petitioning creditors are: Cobra Electronics Group, Phone–Mate Inc., Code–A–Phone Corporation, Southwestern Bell Telecommunications, Inc. and Northwestern Bell Phones.

management. The fraudulent scheme resulted in an inventory shortfall of approximately $65 million, which, when coupled with falling sales, revocation of numerous lines of credit, shareholder lawsuits and an SEC investigation, left Crazy Eddie's business in what the parties describe as an "almost moribund state." New management's efforts to reverse this dismal trend included holding a meeting on or about March 28, 1989, with approximately 15 of Crazy Eddie's largest unsecured vendors to discuss a moratorium on payment of its trade debt and a possible out of court reorganization. As a result of that meeting, an unofficial unsecured creditors' committee (the Unofficial Creditors' Committee) was formed consisting of five of Crazy Eddie's largest vendors representing 60% of its outstanding, unsecured vendor debt. The Unofficial Creditors' Committee subsequently retained its own legal counsel and Arthur C. Unger and Company (Unger & Co.) as its financial consultant. None of the petitioning creditors attended the March 28 meeting.

From March through May, 1989, Crazy Eddie provided the Unofficial Creditors' Committee with financial data relating to its historical and current business operations, culminating in what Crazy Eddie labels "an agreement in principle" on the major elements of an out of court workout. Crazy Eddie also asserts that vendors not directly represented by the Unofficial Creditors' Committee were kept apprised of the negotiations either through written communications and/or by the receipt of certain financial projections and a proposed repayment program distributed at an electronics trade show held on June 2, 1989. In particular, Crazy Eddie maintains that at least two of the five petitioning creditors attended the trade show and received these documents, which were also subsequently provided to TBY & F. Based on their own review of this information and an independent financial analysis prepared by Unger & Co., the petitioning creditors determined that the proposed repayment program was unworkable and concluded that Crazy Eddie could not survive without court intervention. Accordingly, they consulted with TBY & F, who advised that an involuntary petition should be filed.

On June 5, 1989, TBY & F filed an involuntary chapter 7 petition pursuant to § 303 of the Code against Crazy Eddie. Crazy Eddie responded by filing a motion (the Dismissal and Sanctions Motion) pursuant to § 305(a)(1) asking that in light of its proposed out of court workout, I dismiss the case in the best interests of the creditors. In its motion papers Crazy Eddie alleged the filing had an immediate and devastating impact on its business, including: the refusal by one of its largest suppliers to ship merchandise; the refusal by one of its credit card affiliations to turn over sales proceeds; the partial freezing by its bank of a line of credit and an appreciable drop in post-filing sales occasioned by a loss of consumer confidence. The Dismissal and Sanction Motion also requested the imposition of sanctions pursuant to Fed.R. Civ.P. 11 and Fed.R.Bankr.P. 9011 for several misstatements allegedly contained in the petition, one of which TBY & F concedes it made in the "heat of battle." The Unofficial Creditors' Committee joined in support of the relief sought in the Dismissal and Sanctions Motion.

The Dismissal and Sanctions Motion was originally returnable on June 20, 1989. Although no papers were filed in response, a review of TBY & F's time records indicates that the firm was preparing to oppose the motion on behalf of the petitioning creditors. TBY & F also prepared, and I entered, an order to show cause and motion (the Intervention Motion) returnable June 20 seeking to have three more creditors intervene in the involuntary case. When it became apparent that unresolved discovery issues would prevent the Dismissal and Sanctions Motion from being heard on June 20, I scheduled a chambers conference with the parties on that day to discuss the impasse. The chambers conference never took place because literally within moments of its scheduled start, Crazy Eddie filed voluntary chapter 11 petitions for itself and thirty-nine subsidiaries, mooting the involuntary case. Thereafter, Crazy Eddie and TBY & F entered into a stipulation with-

drawing with prejudice both the Dismissal and Sanctions Motion and the Intervention Motion.

■ Section 503(b)(3)(A) allows reimbursement for actual, necessary expenses incurred by a creditor that "files" an involuntary petition; § 503(b)(4) allows reasonable compensation of attorneys' and accountants' fees arising in connection with expenses qualifying under § 503(b)(3). What is contemplated by the term "files" is not spelled out in the Code and thus, in passing on TBY & F's request, I must answer two questions: first, whether the absence of an order for relief based on the involuntary petition precludes compensation under §§ 503(b)(3)(A) and (b)(4); and second, whether that compensation, if payable, should include fees and expenses beyond those incurred in the preparation and filing of the involuntary petition. The parties did not cite any cases dealing with an award of compensation when the trial on the merits of an involuntary petition is mooted by the debtor's voluntary filing for relief. However, there is authority under both the Code and the repealed Bankruptcy Act of 1898 (the Act) which indicates that when the involuntary petition is rendered moot, rather than dismissed on the merits, the petitioning creditors are entitled to compensation.

For example, in *Feldblum v. Paramount Pictures, Inc.* (*In re Paramount Publix Corp.*), 85 F.2d 596 (2d Cir.1936) (Act case), the alleged debtor filed an answer contesting the validity of an involuntary petition and demanded a trial. Thereafter, the debtor and the petitioning creditors engaged in pretrial motion practice which resulted in a trial date being set. Prior to the trial date, the debtor informed the petitioning creditors that it would be filing a voluntary petition and that it would consent to an adjudication. The petitioning creditors, however, insisted that the adjudication be entered under the involuntary proceeding. Although adjudication was entered on the voluntary petition, the court found that the petitioning creditors' attorney was entitled to a portion of his fees, holding that

> [t]he debtor's voluntary adjudication after resisting adjudication in the prior involuntary proceeding ought not to be the means of depriving the attorney for the petitioning creditors of all compensation.

*Id.* at 597.

■ The *Paramount* court cited approvingly from the decision in *In re Arcadia Print Works*, 1 F.2d 463 (D.Mass.1923). In *Arcadia*, an involuntary petition was superseded by a voluntary petition. The referee dismissed the involuntary petition and denied a request for attorneys' compensation on the grounds that the petitioning creditors and their counsel knew the petition was unnecessary and that it was filed simply to generate fees. On appeal, the district court reversed, finding that while it did not wish to encourage this practice, the petitioning creditors "were acting entirely within their legal rights in bringing their petition, [and that compensation of attorneys' fees was warranted] whatever may have been their motives." [2] *Id.* at 464. *See also In re Anderson Motor Co.*, 18 F.2d 1001, 1002 (N.D.Tex.1927) (no reason found for going to the expense, trouble and time of trial on the involuntary petition when debtor subsequently filed a voluntary petition, although petitioning creditors were allowed to prove a claim for attorneys' fees).

---

**2.** A similar result was reached in *Blair & Co. v. Foley* (*In re Blair*) 495 F.2d 299 (2d Cir.1974) where the court found that the debtor's subsequent filing of a voluntary petition mooted the appeal of an order reversing the entry of an involuntary adjudication. Although the merits of the involuntary petition no longer presented a live controversy, the court held, in part, that the petitioning creditors were entitled to their legal fees "[s]ince the statute [§ 64(a)(1) of the Act] allows such fees for the mere act of petitioning, even though no adjudication has been made ..." *Id.* at 301. While I agree with the *Blair* award of compensation, under the Code petitioning creditors are not entitled to attorneys' fees merely by the act of filing. This is so because § 303(i) of the Code provides that the debtor may recoup its costs and other damages from the petitioning creditors when the involuntary petition is defeated. Thus, the Code not only requires more than the mere act of filing but it also exposes the petitioning creditors to liability if the filing is ultimately dismissed on grounds other than consent.

At least one noted treatise suggests that this same result should obtain under the Code. *See* 1 W. Norton, *Norton Bankruptcy Law and Practice* § 12.29 at 12–44 (1981). A second treatise, although not addressing the effect of a mooted involuntary filing, posits that the "only risk of nonpayment should be failure to prevail in a trial on the merits of the petition." S. Bernstein & L. King, *Collier Bankruptcy Compensation Guide* ¶ 7.04[2] at 7–15 (1990). The court in *In re Baldwin–United Corp.*, 79 B.R. 321 (Bankr.S.D.Oh.1987), albeit without extended discussion, has come to a similar conclusion. In *Baldwin,* the court awarded petitioning creditors' counsel a reasonable amount of compensation for investigation and research incurred prior to the filing of two involuntary petitions, despite the fact that the debtors filed voluntary petitions just three minutes later. The *Baldwin* court found that the extended prefiling inquiry was needed to ensure that the petition would not be dismissed, thereby subjecting the petitioning creditors to the costs, fees and damages available to the debtor under § 303(i) of the Code. An implied finding in the *Baldwin* decision is that the voluntary filing did not negate the petitioning creditors' entitlement to compensation. Conversely, in *Paradise Hotel Corp. v. Bank of Nova Scotia*, 842 F.2d 47 (3rd Cir.1988) the debtor disputed, *inter alia,* the petitioning creditors' allegation that it was not paying its debts when due, but given the impact the involuntary petition had on its relations with other creditors, felt a voluntary petition was its only option. The *Paradise* debtor, however, obtained a stay of the involuntary proceeding in order to preserve its challenge to the merits of the petition and its ability to recover damages against the petitioning creditors. *Id.* at 48–49.

██ Here, there does not appear to be any risk that the petitioning creditors would not have prevailed had the trial on the merits of the involuntary petition gone forward. In the Dismissal and Sanctions Motion, Crazy Eddie did not allege that the petitioning creditors failed to meet the statutory requirements of § 303 for filing the petition. Rather, Crazy Eddie sought dismissal on the discretionary provisions of § 305, in "the interests of creditors...." In any event, Crazy Eddie stipulated to the withdrawal of the Dismissal and Sanctions Motion with prejudice, thereby precluding any review of the merits of the involuntary filing. Similarly, Crazy Eddie's opposition to TBY & F's fee request is based in large part on the fact that the filing dashed any prospects for an out of court workout. Nowhere is a challenge raised to the substantive merits of the petition. There is nothing in the record to suggest that the petitioning creditors were not acting within their statutory rights and, but for Crazy Eddie's preemptive act of filing a voluntary petition, would have succeeded in prosecuting the involuntary petition.

Nor do I find that compensation should be denied due to the allegedly disastrous impact the involuntary filing had on Crazy Eddie's business relations or because the petition contained what TBY & F concedes is at least one misstatement of fact. As for the postfiling impact, again I note that it does not appear that the petitioning creditors did anything other than exercise rights afforded them under § 303 of the Code. If Crazy Eddie felt strongly that its creditors' interests could be better served outside of this court, it should have pressed its dismissal request under § 305. Alternatively, it could have done what the debtor in *Paradise Hotel* did and sought a stay of the involuntary case. That the involuntary filing had the immediate and dire impact alleged by Crazy Eddie which necessitated the voluntary filing indicates creditor support for an out of court reorganization may not have been as strong as the Debtor asserts.

Turning to the misstatements in the involuntary petition, TBY & F's conduct may well have provided fodder for the imposition of sanctions under Fed.R.Bank.P. 9011 as requested by Crazy Eddie. Indeed, TBY & F conceded that it knew or should have known that Crazy Eddie had not closed all of its retail outlets as stated in the petition. However, these misstatements are not in and of themselves grounds for the denial of all compensation for an otherwise valid fil-

ing, the more so since Crazy Eddie withdrew the Dismissal and Sanctions Motion with prejudice.

In short, I find no basis for Crazy Eddie to successfully oppose TBY & F's fee request on what are essentially the same grounds raised in the withdrawn Dismissal and Sanctions Motion. Had TBY & F's conduct given rise to a cause of action in favor of Crazy Eddie, the Debtor should have preserved its rights pending the voluntary proceeding and revisited them at a later, more appropriate date.

 I also find that TBY & F is entitled to compensation for more than just the preparation and filing of the involuntary petition. I agree with the court's analysis in *In re Hanson Industries, Inc.*, 90 B.R. 405, 410 (Bankr.D.Minn.1988) which held that §§ 503(b)(3)(A) and (b)(4) include compensation for the preparation, filing and *adjudication* of an involuntary petition. This reading of the Code recognizes that an involuntary proceeding can become an expensive and aggressively contested matter. *See Collier, supra* ¶ 7.04[1] at 7–14. A more limited interpretation of the Code is indeed "out of step with the realities" of today's bankruptcy practice; it would be disingenuous to compensate for the filing of the petition but not its successful adjudication, particularly since the petitioning creditors are liable under § 303(i) if the case is abandoned or dismissed. *See In re Hanson*, 90 B.R. at 410, *quoting among others, In re Baldwin–United*, 79 B.R. at 337. I agree that the "more reasoned approach in a case such as this is to allow fees and costs incurred [for the preparation and filing a petition] and, if there is opposition, to reasonable and necessary efforts to pursue the petition to successful conclusion...." *Hanson*, 90 B.R. at 410.

 However, to find that TBY & F is entitled to pre and post-filing compensation is not to automatically award it the $36,-848.50 in fees and $5,247.39 in expenses requested in its application. It is beyond dispute that all applicants under § 503(b) have the burden of establishing entitlement to an award of compensation by a preponderance of evidence. *In re Baldwin–United*, 79 B.R. at 336, *citing In re 1 Potato 2, Inc.*, 71 B.R. 615, 618 (Bankr.D.Minn.1987); *In re S & T Industries, Inc.*, 63 B.R. 656, 657 (Bankr.W.D.Ky.1986). Several entries on TBY & F's application are not compensable under § 503(b)(4) as they are not legal fees incurred to prosecute the involuntary filing or defend its merits. Among the noncompensable services are: preparing a press release announcing the involuntary filing and handling press inquiries; amending the petition which TBY & F concedes was at least partially inaccurate; researching and responding to the request for sanctions which was based on the inaccuracy of the petition; and researching and preparation of motions for the appointment of a trustee or examiner and for emergency financing, which were never filed in either the involuntary or voluntary case, thus making it impossible for me to determine their appropriateness. A number of these services appear in entries which also describe compensable services, although only one lump sum time allotment is made.[3] There are also a number of entries containing generic descriptions such as "phone calls with several creditors" and "meetings re status and strategy" which do not supply enough information for me to characterize them as compensable or noncompensable. All told, the noncompensable and/or inadequately described services are found in a portion of roughly 45 of the 115 entries. Because TBY & F has failed to meet its burden with respect to these entries, I

---

**3.** For example, in an entry dated June 8, 1989, 5.30 hours of time was billed for "telephone conference with all Petitioners re strategy; discussion with [another firm member] re strategy; discussion with [another firm member] re amending petition." While detail is lacking, it appears that all or part of the strategy discussions might be compensable, although I have denied any fee award relating to amending the

deficiencies in the petition. Likewise, a substantial number of entries refer globally to time incurred opposing the Dismissal and Sanctions Motion. Since these entries fail to specify what portion of the Dismissal and Sanctions Motion was involved, I can only assume that at least a part of this time related to the noncompensable response to the sanction request.

am reducing the legal services request by 25%, for a fee award of $27,636.38.

■ I also find it necessary to reduce the expenses that TBY & F has requested. The majority of expenses are identified only generically, for example as "phone", "photocopy" or "overtime word processor" with a corresponding date. It appears that at least some of the expenses must relate to services which I have deemed noncompensable. Second, there are a number of expense entries which are dated subsequent to Crazy Eddie's voluntary filing on June 20, 1989. There are no corresponding entries for legal services rendered after June 20, 1989, and without any detail, TBY & F has failed to establish entitlement to an award after that date. Accordingly, I find it appropriate to deduct 25% of the expenses incurred prior to June 20, 1989 and deny reimbursement for all those after June 20, for a total expense award of $2,077.26.

■ For these same reasons, the amounts I have deducted cannot be compensated under § 503(b)(3)(D) as TBY & F has failed to establish that it provided a "substantial contribution" to the estate. TBY & F did not argue, nor can I see how, amending a defective petition or responding to a sanction request arising therefrom could result in any contribution to the estate, much less a substantial one. I take a similar view of the press release, particularly since only three additional creditors sought to join the involuntary petition despite the presumed heightened awareness generated from the media exposure. Nor has any contribution been shown by the preparation of the two motions subsequently abandoned by the petitioning creditors. Finally, the lack of detail in the entries described above also prohibits the award of compensation under TBY & F's alternative theory.

To recap, I award TBY & F expenses pursuant to § 503(b)(3)(A) in the amount of $2,077.26 and legal fees pursuant to § 503(b)(4) in the amount of $27,636.38. No question having been raised concerning the administrative solvency of the estate, the award is to be paid in full.

SETTLE ORDER consistent with this decision.